RSR CORPORATION, Petitioner,

v.

FEDERAL TRADE COMMISSION, Respondent.

No. 77–1413.

United States Court of Appeals, Ninth Circuit.

July 30, 1979.

Rehearing Denied July 30, 1979.

Carleton A. Harkrader (argued), of Wald, Harkrader & Ross, Washington, D.C., for petitioner.

Jane P. Schlaifer (argued), of Federal Trade Commission, Washington, D.C., for respondent.

Before KILKENNY and CHOY, Circuit Judges, and PREGERSON *, District Judge.

PREGERSON, District Judge:

## INTRODUCTION

RSR Corporation (RSR) appeals from a Federal Trade Commission (FTC) order requiring divestiture of three lead smelting plants acquired through a 1972 merger with Quemetco, Inc. (Quemetco). The FTC adopted, with some modifications, the findings of the administrative law judge (ALJ) that the merger violated Section 7 of the Clayton Act, 15 U.S.C. § 18. RSR asserts that the following FTC findings were not supported by substantial evidence and were made through the application of erroneous standards of law:

(1) Secondary lead is the relevant product market;

(2) The entire United States is the relevant geographic market;

(3) RSR's acquisition of Quemetco may substantially lessen competition in the United States secondary lead market;

(4) Divestiture by RSR of all pre-merger assets except the Seattle plant is the proper remedy.

We affirm.

## FACTS

Before the RSR/Quemetco merger, RSR operated two lead smelting plants, one in Dallas and the other in Newark. These plants produced secondary lead, which is lead that is recycled from scrap automobile batteries and tetraethyl slag, as distinguished from primary lead, which is lead that is processed from raw lead ore. RSR's principal product was "hard" lead, which is lead containing other metals, such as antimony or cadmium. RSR also produced some "soft" lead, which is relatively pure. In 1972 RSR, the country's second largest producer of secondary lead, produced 12.16% of the secondary lead in the United States.

Before the merger Quemetco, a wholly-owned subsidiary of St. Joe Minerals Corporation, operated lead smelting plants in Seattle, Indianapolis, and City of Industry, California. A fourth plant, in Walkill, New York, was nearing completion at the time of the merger. In 1972 Quemetco produced 7.02% of the secondary lead in the United States and ranked fifth among the nation's secondary lead producers.

After the merger in late 1972, the newly-constituted RSR remained the second-largest secondary lead producer, but had a new combined production total of 19.18% *pro forma* of total secondary lead production in the United States. Within a few months, the merged company had five operating plants: Seattle, Dallas, Indianapolis, City of Industry, and Walkill. RSR's Newark plant was not replaced when its lease terminated in early 1973, even though RSR had planned before the merger to construct a new plant there.

The FTC charged in April 1974 that the RSR/Quemetco merger violated Section 7 of the Clayton Act because the merger would substantially lessen competition in the secondary lead market. After holding hearings, the ALJ decided that Section 7 had been violated in the secondary lead market, which he found to be a proper submarket within the overall lead market. Since the ALJ found that market overlap between RSR and Quemetco was limited to the Midwest, he recommended that RSR divest itself of the Indianapolis plant.

* The Honorable Harry Pregerson, United States District Judge for the Central District of California, sitting by designation.

Both sides appealed to the full FTC, which adopted the ALJ's decision with some modifications. The FTC agreed that the secondary lead market was the proper submarket, that secondary lead was the relevant product market, that the United States as a whole was the appropriate geographic market, and that the RSR/Quemetco merger could substantially lessen competition in the national secondary lead market. The FTC found, however, that before the merger the two companies had competed in markets in addition to the Midwest market, and that this competition took place in regions accounting for the major share of domestic lead consumption. The FTC therefore ordered RSR to divest itself of all pre-merger Quemetco assets except the Seattle plant, leaving RSR with two plants, in Dallas and Seattle, and Quemetco with three plants, in Walkill, Indianapolis, and the City of Industry. The FTC reasoned that the two newly-reconstituted firms could then compete in the West and Midwest markets immediately, and in the Northeast market as soon as RSR replaced its former Newark plant.

## STANDARD OF REVIEW

■ The standard of review that this court must apply to the FTC's findings of fact is set out in Section 5(c) of the F.T.C. Act, 15 U.S.C. § 45(c): "The findings of the Commission as to the facts, if supported by substantial evidence, shall be conclusive." This statutory language has been judicially interpreted to confine the exercise of appellate review of agency fact finding to a determination whether the agency's findings are supported by substantial evidence. *Ash Grove Cement Co. v. F.T.C.*, 577 F.2d 1368, 1378 (9th Cir. 1978). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolo v. Federal Maritime Commission*, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966). As the Fifth Circuit aptly summarized:

> Findings of fact cannot and will not be set aside if the evidence in the record reasonably supports the administrative

conclusion, even though suggested alternative conclusions may be equally or even more reasonable and persuasive. The findings must stand unless they were wrong, and they cannot be wrong—that is, reversibly wrong—if substantial evidence supports them.

*Colonial Stores Inc. v. F.T.C.*, 450 F.2d 733, 739–40 (5th Cir. 1971). *See also Carter Products, Inc. v. F.T.C.*, 268 F.2d 461, 496–97 (9th Cir.), *cert. denied*, 361 U.S. 884, 80 S.Ct. 155, 4 L.Ed.2d 120 (1959).

## DISCUSSION

### PRODUCT MARKET

■ The parties first disagree over whether the overall lead market (including both primary and secondary lead) or the secondary lead market alone is the relevant product market for testing the RSR/Quemetco merger under Section 7. RSR contends that substantial competition exists between primary and secondary producers in the production of soft lead; thus, the overall lead market must be considered. The FTC, relying on distinctions between the primary and secondary lead markets, argues that the secondary lead market alone is the relevant product market.

The factors used to determine the relevant product market in an antitrust case were set out by the Supreme Court in *Brown Shoe Co. v. United States*, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). The Court stated that the outer boundaries of a product market can be determined by the "reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Id.* at 325, 82 S.Ct. at 1523. The Court observed that well-defined submarkets may also exist which, in themselves, can constitute product markets for antitrust purposes, and suggested that determining the boundaries of such a submarket could be done "by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and

specialized vendors." *Id.* The Court then explained that, since Section 7 prohibits any merger that may substantially lessen competition in *any* line of commerce, the effects of a merger must be examined in each economically-significant submarket to determine if there is a reasonable possibility that the merger will substantially lessen competition in that submarket. If the merger could do so, it violates Section 7. *Id.* Finally, the Court held that these indicia apply to a horizontal merger, the type of merger involved in the instant case. *Id.* at 336, 82 S.Ct. 1502.

In *International Telephone & Telegraph Corp. v. General Telephone & Electronics Corp.,* 518 F.2d 913, 932 (9th Cir. 1975), this court recognized that the *Brown Shoe* indicia are to be used as practical aids rather than as conclusive evidence on the submarket issue. We commented: "Whether or not a court is justified in carving out a submarket depends ultimately on whether the factors which distinguish one purported submarket from another are 'economically significant' in terms of the alleged anticompetitive effect." *Id.*

In determining that the secondary lead market is a proper submarket to be used as the relevant product market, the ALJ and the FTC relied heavily on the *Brown Shoe* indicia. In doing so they found that the distinctions between the overall lead market and the secondary lead market are economically significant.

We have considered each of the *Brown Shoe* indicia separately and find that substantial evidence supports the FTC's determination that the secondary lead market is the relevant product market for testing the RSR/Quemetco merger. We have briefly summarized some of this evidence below.

*Industry or public recognition of the submarket as a separate economic entity*: Evidence was presented to show that the lead industry distinguishes between primary and secondary lead in terms of the products and their producers. RSR contends that this recognition signifies only that the industry is aware of the different raw material source for each type of lead. Nevertheless, evidence indicated that consumers and lead producers, as well as national production reports, distinguish between the two types of lead.

*Product's peculiar characteristics*: Secondary lead is derived from recycling other lead products, not from smelting raw lead ore. As a result, secondary lead as a rule contains impurities (primarily metals) not found in primary lead. Secondary lead, although it can be purified almost to the degree of pure lead, is generally used as hard or metallic lead. Primary lead, since it is pure and free of hardening metals, is generally used as soft lead. Soft lead and hard lead are generally not used for the same purposes. Primary and secondary soft lead can sometimes be interchanged, as can primary and secondary hard lead, but certain uses require either primary lead, while other uses require secondary lead. Moreover, it is usually not economical for a primary producer to manufacture hard lead. Secondary producers obtain some soft lead as a by-product of the manufacture of antimonial lead; due to impurities, this soft lead is generally not suitable for most industrial soft lead uses.

*Distinct customers*: At the time of the FTC hearing, hard lead was chiefly used for automobile battery posts and grids, while soft lead was used for battery oxides and tetraethyl lead, an antiknock additive to gasoline. Battery manufacturers were thus the major customers of both primary and secondary lead producers. Evidence was presented to show that some customers specify not only that they require hard or soft lead but also that they want primary or secondary lead.

*Distinct vendors*: Most of the lead produced by primary producers is pure or soft lead. Although metal can be added to the pure lead to harden it, the evidence shows that it is not economical to do so. Moreover, casting characteristics of artificially-hardened lead make it unsuitable for battery grids and posts. Thus, primary producers generally restrict their production to soft lead. Secondary producers, on the other hand, chiefly produce hard lead. During

the production of antimonial lead, a hard lead, some soft lead is also produced. At the time of the merger, secondary producers were using most of this soft lead in their internal operations rather than selling it to manufacturers of battery oxides.

RSR argues that it now produces more soft lead than at the time of the merger, allowing it now to compete more effectively with primary producers. RSR also argues that increased use of calcium-lead batteries (the "maintenance-free" batteries) is changing the lead market because calcium lead can be made as easily from primary lead as from secondary lead. This change, according to RSR, gives secondary producers another reason to heighten competition with primary producers. The FTC, however, found that the future of calcium-lead batteries is too speculative to be given much weight in evaluating a 1972 merger. Moreover, we note that post-merger evidence is entitled to only "extremely limited" weight in refuting charges of anticompetitive effect made in connection with a Section 7 challenge. *United States v. General Dynamics Corp.*, 415 U.S. 486, 504–05, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974); *Ash Grove Cement Co. v. F.T.C.*, 577 F.2d 1368, 1378–79 (9th Cir. 1978).

*Distinct prices*: RSR presented evidence that only one worldwide price is set for lead: no distinctions between primary and secondary lead are made on the London Exchange. But the evidence showed and the FTC found that, although both primary and secondary producers discount the price of lead, secondary lead customarily sells for about 10% less than primary lead.

*Sensitivity to price changes*: Because secondary lead is generally shipped over shorter distances than primary lead, secondary producers customarily ship by truck while primary producers ship by rail. Evidence was presented to show that trucking costs vary more widely than rail costs, causing secondary lead prices to vary accordingly.

Although some of the evidence presented to the FTC was open to differing interpretations, we are not permitted to second-guess its findings if supported by substantial evidence. We hold that the findings were so supported and that the FTC correctly applied the law in making its findings on relevant product market.

## GEOGRAPHIC MARKET

As its second contention, RSR strenuously argues that the relevant geographic market to be used in testing the RSR/Quemetco merger for a Section 7 violation should not be the entire United States. Nonetheless, RSR does not suggest an alternate market.

The parties agree that, due to high trucking costs, secondary lead producers attempt to ship their products to customers located within a few hundred miles of the plants. Since the RSR and Quemetco plants were located in different areas of the country, RSR argues that Quemetco and RSR were not actually competing anywhere in the country. Alternatively, RSR argues that the only place in which there might have been competition was in the Midwest market, which could be served by both Quemetco's Indianapolis plant and RSR's Dallas plant.

The ALJ found that competition existed between the two companies only in the Midwest area, but determined that the entire United States was the relevant geographic market because the merger lessened competition in the nationwide secondary lead market. The FTC, however, found that RSR and Quemetco competed to a significant degree, particularly in the Midwest and Northeast, through the Dallas/Indianapolis and Newark/Walkill plants. The FTC assumed that, without the merger, RSR would have replaced its Newark plant with another plant in the Newark area, and that the new plant would have competed with Quemetco's new Walkill plant.[1]

---

1. Evidence was presented to the FTC showing that RSR had intended to replace the Newark plant with a new plant, also in Newark, and

had even proposed a stock offering to finance the construction. Those plans were dropped when the merger took place, since the Walkill,

In determining relevant geographic market we again look for guidance to *Brown Shoe Co. v. United States, supra,* 370 U.S. 294, 336–37, 82 S.Ct. 1502, 1530, 8 L.Ed.2d 510 (1962):

> The criteria to be used in determining the appropriate geographic market are essentially similar to those used to determine the relevant product market. . . . The geographic market selected must, therefore, both "correspond to the commercial realities" of the industry and be economically significant. . . . *The fact that two merging firms have competed directly on the horizontal level in but a fraction of the geographic markets in which either has operated, does not, in itself, place their merger outside the scope of § 7.* That section speaks of "any . . . section of the country," and if anticompetitive effects of a merger are probable in "any" significant market, the merger—at least to that extent—is proscribed. (Emphasis added.)

To decide that the merger violated Section 7, the FTC was not required to find that Quemetco and RSR competed on a nationwide basis.

Although the FTC recognized that high trucking costs cause secondary producers to ship most of their product to customers within a few hundred miles, evidence was presented to show that the distances over which secondary lead producers were willing to ship products varied according to economic and market conditions, including plant size, secondary lead prices in a certain region, and fluctuations in transportation costs. RSR relies heavily on data showing that Quemetco, in 1971 and 1972, shipped lead to less than ⅓ of the states. But the evidence also showed that the states into which Quemetco shipped its lead were the states where most of the lead was consumed.[2] Furthermore, the evidence showed that many of the major battery manufacturers, the primary consumers of antimonial lead, are concentrated in the Midwest, with smaller groups in the Northeast and in Southern California. Thus, the fact that RSR and Quemetco did not compete in every state is of little relevance when many states generate little or no demand for secondary lead. Finally, evidence was also presented showing that regional pricing patterns for secondary lead are interrelated.[3]

Evidence on the pre-merger competition between RSR and Quemetco, coupled with evidence of pricing interdependence nationwide and evidence of the ability of secondary producers to ship lead into states in which most secondary lead is consumed, is substantial. That evidence is sufficient to support the FTC's factual findings on the relevant geographic market issue.

■ RSR contends, however, that the FTC's findings are incorrect as a matter of law. It relies on two 1974 Supreme Court decisions, *United States v. Connecticut National Bank,* 418 U.S. 656, 667, 94 S.Ct. 2788, 41 L.Ed.2d 1016 (1974); and *United States v. Marine Bancorporation, Inc.,* 418 U.S. 602, 622, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974). These cases hold that the proper geographic market should be defined as the area in which the acquired firm is in direct competition with other firms in the industry or in which it is marketing a significant degree of goods or services. RSR argues that those cases compel a finding that, since RSR and Quemetco did not directly compete nationwide, the national secondary lead market cannot be the proper geographic market.

We do not accept this argument. Those cases involved the heavily-regulated bank-

New York plant could serve the same market as a Newark plant.

**2.** For example, in 1972 the states within a 300 mile radius of Quemetco's plants accounted for over 60% of antimonial lead consumption. In 1971, RSR shipped lead to states accounting for over 70% of antimonial lead consumption.

**3.** Evidence indicated that when one region discounts the price of secondary lead, the price is eventually affected nationwide. If prices are higher in one area, producers are willing to ship greater distances to get their product into that area. In turn, the price offered in other areas will rise so that consumers there will be assured of a supply of secondary lead.

ing industry, a fact upon which the court strongly relied in holding that the relevant geographic market was only that area in which the regulatory agencies permitted the banks to provide services. *United States v. Marine Bancorporation, Inc.,* 418 U.S. at 641, 94 S.Ct. 2856. Because the locality of the competition was regulated, these cases are factually distinguishable from the situation before this court where unregulated market forces and other economic considerations determine the region where competition in fact occurs. Here these considerations indicate nationwide competition in the secondary lead market. Thus, the relevant geographic market is, as found by the FTC, the entire United States.

We believe that the FTC's factual findings are supported by substantial evidence and that the standards of law applied by the FTC in determining the relevant geographic market are correct.

*LESSENING OF COMPETITION*

■ RSR argues the FTC erred in finding that the RSR/Quemetco merger substantially lessened competition in the secondary lead industry. It is undisputed that, prior to their merger, RSR was the second-largest and Quemetco the fifth-largest secondary lead producer, in the country. After the merger, RSR remained the second-largest producer but its market share increased from 12.16% to 19.18%. Prior to the merger, the top four secondary lead producers had 65.40% of the secondary lead market; the top eight firms had 81.41% of the market. As a result of the merger, the market shares increased to 72.41% for the top four and 83.77% for the top eight. Evidence was introduced, however, that in the years prior to the merger more firms had left the secondary lead business than had entered it, including several battery manufacturers who tried recycling secondary lead for a time but gave up, and that start-up costs for a new entry into the business were steadily rising.

■ In finding that these factors supported the conclusion that the RSR/Quemetco merger was inherently likely to lessen competition in the secondary lead industry, the FTC relied on the Supreme Court's holding in *United States v. Philadelphia National Bank,* 374 U.S. 321, 363, 83 S.Ct. 1715, 1741, 10 L.Ed.2d 915 (1963), where the Court stated:

[W]e think that a merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market, is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects.

The Court further noted that "if concentration is already great, the importance of preventing even slight increases in concentration and so preserving the possibility of eventual deconcentration is correspondingly great." *Id.* at 365 n. 42, 83 S.Ct. at 1742. In *Philadelphia National Bank,* where the top four firms had a market share of 78%, the Court found that a post-merger market share of 30% raised an inference that the merger was anticompetitive. *Id.* at 364–65, 83 S.Ct. 1715. Post-merger market data thus may be sufficient to support a finding that a merger was anticompetitive. The Court cautioned, however, that a merger resulting in less than a 30% post-merger market share for the merged company would not raise an inference that the merger did not violate Section 7. *Id.* at 364 n. 41, 83 S.Ct. 1715.

RSR argues that the post-merger data—showing the RSR/Quemetco market share to be 19.18% and the top four's market share to be 72.41%—do not present a market share large enough to create a presumption of illegality. In rebuttal, the FTC points to cases holding concentrations smaller than those involved here sufficient to raise a presumption of illegality. *See United States v. Pabst Brewing Co.,* 384 U.S. 546, 551–52, 86 S.Ct. 1665, 16 L.Ed.2d 765 (1966) (merger of tenth and eighteenth largest beer sellers, resulting in a market share of 4.49%, where top eight had 59% of

the market); *United States v. Von's Grocery Co.*, 384 U.S. 270, 274, 86 S.Ct. 1478, 16 L.Ed.2d 555 (1966) (merger of third and sixth largest grocery chains, resulting in a market share of 7.5% where top four had market share of 28.8%). Moreover, even if the FTC was incorrect in finding a violation of Section 7 based solely on market share, its finding of anticompetitive effect is supported by evidence showing that the merged RSR extracted more favorable terms in the marketplace than were obtained by the separate companies before the merger.

RSR next contends that, even if some anticompetitive effects are felt as a result of the merger, competition in the overall secondary lead market will increase because the enlarged RSR will be better able to compete with the industry giant, NL Industries. A similar argument was rejected by the Court in *United States v. Philadelphia National Bank, supra*, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1973), where the merging banks argued that larger banks in the Philadelphia area were needed to compete effectively with the New York City banks. Although the Court recognized that even if all commercial banks in Philadelphia were merged, the resulting bank would still be smaller than the largest New York City bank, the Court nevertheless held that the merger could not be justified on those grounds, stating that anticompetitive effects in one market cannot be offset by procompetitive effects in another market. *Id.* at 370–71, 83 S.Ct. 1715. We similarly reject RSR's attempt to justify the RSR/Quemetco merger on such grounds.

RSR advances two additional arguments to support its contention that the FTC improperly applied the law when it found the merger to be anticompetitive. First, RSR asserts that its merger with Quemetco is the type of merger impliedly approved by *Philadelphia National Bank* where the Court observed that the case did not involve "two small firms in a market [who] propose to merge in order to be able to compete more successfully with the leading firms in that market." 374 U.S. at 370–71, 83 S.Ct. at 1745. This argument—a variation of the argument just rejected— must also fail, because a merger of the second and fifth largest firms in the secondary lead market is not the merger of "two small firms." Second, RSR argues that the merger can be justified because it allows greater efficiency of operation. This argument has been rejected repeatedly. *E. g., United States v. Philadelphia National Bank, supra*, 374 U.S. 321, 370, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963); *Crown Zellerbach Corp. v. F.T.C.*, 296 F.2d 800, 825 (9th Cir. 1961), *cert. denied*, 370 U.S. 937, 82 S.Ct. 1581, 8 L.Ed.2d 807 (1962).

We believe that substantial evidence supports the FTC's finding that the merger was anticompetitive. Moreover, we find that the FTC adhered to the proper legal standard in determining that the RSR/Quemetco merger had a possibility of substantially lessening competition in the secondary lead market.

## DIVESTITURE AS APPROPRIATE REMEDY

The FTC determined that complete divestiture of all pre-merger Quemetco assets would not be necessary to restore competition in the secondary lead market. The FTC instead proposed that RSR divest itself of the Indianapolis, Walkill, and City of Industry plants, retaining its Dallas plant and the former Quemetco plant in Seattle. This proposal was designed, according to the FTC, to restore competition between the two firms in the Midwest and to begin competition in the West.[4] Moreover, if RSR replaces its Newark plant, competition could be restored in the Northeast. The end result of the FTC's proposal would be that RSR would have two plants now, three when the Newark plant is replaced, to compete with Quemetco's three plants.

---

4. Dallas would compete with Indianapolis; Seattle would compete with City of Industry; and Newark would compete with Walkill.

RSR finally urges us to find the FTC's divestiture proposal too broad, arguing that a more limited divestiture order is the proper remedy.

When a court reviews the discretionary relief fashioned by the FTC, particular emphasis is placed on the substantial evidence rule. *Consolo v. Federal Maritime Commission, supra,* 383 U.S. 607, 620–21, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966). Once a violation of Section 7 has been established, divestiture is the usual remedy. *Ford Motor Co. v. United States,* 405 U.S. 562, 573–74, 92 S.Ct. 1142, 31 L.Ed.2d 492 (1972). As the Court noted in *United States v. E. I. duPont de Nemours & Co.,* 366 U.S. 316, 330–31, 81 S.Ct. 1243, 1252, 6 L.Ed.2d 318 (1961), "Divestiture has been called the most important of antitrust remedies. It is simple, relatively easy to administer, and sure. It should always be in the forefront of a court's mind when a violation of § 7 has been found." (Footnotes omitted.)

The FTC clearly could have ordered complete divestiture of all pre-merger Quemetco assets. We do not believe that its attempt to tailor a limited divestiture order should be thwarted.[5]

### CONCLUSION

After carefully considering the evidence presented to the FTC, we cannot say that its factual determinations were not supported by substantial evidence. Moreover, we are convinced that proper standards of law were used by the FTC in making those determinations. Finally, we believe that the FTC's proposed divestiture plan is a reasonable one.

Our previous opinion dated January 8, 1979, West Slipsheet p. 74 is withdrawn. The petition for rehearing is denied and the suggestion for rehearing in banc is rejected.

---

**5.** Before the merger, Quemetco also owned the Bestolife plant in Dallas. The plant used lead to manufacture metallic-lead lubricants. The FTC ordered RSR to divest itself of the Bestolife plant. RSR argues that, since the Bestolife plant is not involved in the secondary lead market at all, the divestiture order is improper. We have noted, however, that complete divestiture of all pre-merger assets is the usual remedy for a Section 7 violation. The fact that the FTC chose to exempt the Seattle secondary lead plant from the divestiture order does not detract from the viability of the general divestiture rule. We decline to find that the FTC erred in ordering the divestiture of Bestolife.