JIM WALTER CORPORATION,
Petitioner,

v.

FEDERAL TRADE COMMISSION,
Respondent.

No. 78–1669.

United States Court of Appeals,
Fifth Circuit.

Sept. 12, 1980.

Schiff, Hardin & Waite, William A. Montgomery, W. Donald McSweeney, Walter C. Greenough, Joseph P. Collins, Chicago, Ill., Thomas C. MacDonald Jr., Tampa, Fla., James W. Kynes, Tampa, Fla., for petitioner.

David C. Shonka, FTC, W. Dennis Cross, Asst. Gen. Counsel, Washington, D. C., for respondent.

Before COLEMAN, Chief Judge, TJOFLAT, Circuit Judge and MITCHELL *, District Judge.

TJOFLAT, Circuit Judge:

Jim Walters Corporation (JWC) appeals from a Federal Trade Commission (FTC) decision (and related divestiture order), finding that JWC's acquisition of Panacon Corporation violated section 7 of the Clayton Act, 15 U.S.C. § 18 (1976). Although JWC contends that the FTC committed numerous errors, both procedural and substantive, we find it necessary to resolve only two of the issues raised: first, whether the FTC had jurisdiction in the case, which we find it did; and, second, whether the FTC's conclusion that the relevant geographic market is national was based on a correct legal analysis of the facts before it. Because we find that it was not, we remand the case to the FTC for such proceedings, not inconsistent with this opinion, as may be appropriate.

* District Judge of the Eastern District of Louisiana, sitting by designation.

I

JWC is a holding company incorporated under the laws of Florida. Celotex Corporation, in turn, is a wholly-owned and closely supervised subsidiary of JWC. Celotex manufactures and retails several lines of construction materials, including a line of asphalt and tar roofing products.

In 1972, Celotex acquired the stock of Panacon Corporation. Panacon, like Celotex, was a manufacturer and retailer of construction materials; and, like Celotex, Panacon had a product line that included tar and asphalt roofing products, which were manufactured by a Panacon division, Philip Carey.[1] Another Panacon division, Carey-Canadian Mines, Ltd., mined asbestos, a product used in the manufacture of a particular type of asphalt roofing. Of the eight Philip Carey roofing plants, one plant manufactured this type of asphalt roofing, and purchased 41% of its asbestos from Carey-Canadian. Panacon was merged into Celotex on April 17, 1972.

Prior to the stock acquisition and merger, Celotex's tar and asphalt roofing operations accounted for 8.83% of all domestic sales, making it the fifth largest producer in the United States. Philip Carey, the sixth largest producer, with an 8.79% share of all domestic sales, was close behind. Following the merger, Celotex became the nation's second largest producer of tar and asphalt roofing, with 17.62% of all sales. With Celotex as the second largest firm, the concentration ratio of the nation's two largest firms was increased from 29.94 to 35.71%, and of the eight largest, from 51.76 to 59.21%.

In 1973, the FTC initiated an investigation into the acquisition, which culminated in a complaint alleging that JWC violated section 7 of the Clayton Act. In particular, the complaint alleged that the effect of the acquisition "may be substantially to lessen competition or to tend to create a monopoly

1. At the time of the acquisition, Philip Carey was in the process of constructing a plant in Elizabethtown, Kentucky, to manufacture polyurethene insulation materials.

in the manufacture, sale, and distribution of all asphalt roofing materials and of built-up roofing and shingles in the United States." Complaint at ¶ 15. The appropriate remedy, according to the government, was for JWC to divest all former Panacon operations as going concerns.[2]

During hearings before an Administrative Law Judge (ALJ), JWC contended: (1) that its subsidiary, Celotex, was the proper party-respondent, and in any event, an indispensable party to the proceedings; (2) that JWC could not be the primary respondent because, as a holding company, it was not engaged in interstate commerce within the meaning of section 7 of the Clayton Act; (3) that the relevant product market included not only tar and asphalt, but also wood, concrete and clay tile roofing products; (4) that the entire United States was not a proper market for section 7 purposes; and (5) that the acquisition would not have anticompetitive or probable anticompetitive effects. If, however, the ALJ found a violation of section 7, JWC argued for a remedy short of divestiture, or, if divestiture were ordered, a remedy limited to the sale of Philip Carey's roofing operations.

The Administrative Law Judge ruled that JWC was engaged in interstate commerce, that Celotex was not an indispensable party, that tar and asphalt roofing products composed the relevant product market, and that both the United States as a whole and a 26-state region of the United States were proper geographic markets. Because he also found that Celotex's acquisition of Panacon would have anticompetitive effects, the ALJ concluded that JWC had violated section 7. Accordingly, he ordered JWC to divest Panacon's tar and asphalt roofing operations in one or more units.

JWC appealed the order to the FTC. While the FTC found insufficient evidence to support a regional market, it adopted the ALJ's findings of fact and conclusions of law in all other respects. The FTC modified the ALJ's order so as to require that Philip Carey be divested as a single unit, and expanded the order to include Philip Carey's Elizabethtown, Kentucky, polyurethene insulation materials plant[3] and Carey-Canadian Mines, Ltd.

JWC next petitioned the FTC for reconsideration of its decision and order, raising two contentions concerning the divestiture order: first, that divestiture of Carey-Canadian Mines, Ltd. and the polyurethene plant should not have been ordered because it was superfluous to the purposes of the remedy, and, in fact, would make compliance with the order more difficult, since a Philips-Carey/Carey-Canadian package would be unattractive to potential purchasers;[4] second, that the FTC should have prepared an environmental impact statement before issuing its order. The FTC ruled that these issues were untimely raised on reconsideration, since JWC had ample opportunity to present them during the initial hearings. But, even had it resolved these issues on the merits, the FTC indicated that it would have held against JWC.

JWC then appealed from the FTC's final order to this Court, contending that the FTC had incorrectly resolved each of the various contested factual and legal issues. We have already indicated that we need consider only two of those issues on this appeal.

## II

### A

The first issue on appeal is whether the FTC had jurisdiction over this action. Section 7 states that,

No corporation engaged in commerce shall acquire, directly or indirectly, the

---

2. Panacon had six divisions, which produced, sold, or distributed numerous different types of products. Panacon's annual sales volume totalled $180,000,000, of which the Philip Carey Division contributed approximately $65,000,000.

3. See fn. 1, *supra.*

4. According to JWC, Canadian government restrictions on the sale or transfer of a Canadian business enterprise to a non-eligible person would make effectuation of a sale of Carey-Canadian to a U.S. corporation difficult.

whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

The jurisdictional prerequisites imposed by this language are that the acquiring and the acquired corporation each be engaged in interstate commerce. *See United States v. American Building Maintenance Industries,* 422 U.S. 271, 95 S.Ct. 2150, 45 L.Ed.2d 177 (1975). JWC contends that *it* is not engaged in interstate commerce and thus, that the FTC lacks jurisdiction over the action. We proceed to a determination of whether JWC was engaged in interstate commerce.[5]

■ Section 7's "engaged in commerce" jurisdictional standard is less encompassing than the "affecting commerce" test that sets the jurisdictional reach of the Sherman Act. *Id.* A corporation is engaged in commerce only if it is "directly engaged in the production, distribution or acquisition of goods or services in interstate commerce." *Id.* at 283, 95 S.Ct. at 2150. JWC argues that because it has no commercial activities except through its subsidiaries, it is not directly involved in the production, distribution or acquisition of goods or services in interstate commerce or otherwise. Thus, according to JWC, the com-

mercial activities of a subsidiary cannot be imputed to its parent in determining whether section 7 jurisdiction exists.

■ We disagree. First of all, the original section 7 "was designed primarily to deal with the evil of the secret acquisition by one corporation of the stock of another corporation, principally those acquisitions by 'holding companies.'" *United States v. Celanese Corporation of America,* 91 F.Supp. 14, 17 (S.D.N.Y.1950). It is illogical to suggest that Congress directed section 7 "primarily at the development of holding companies," *Brown Shoe Co. v. United States,* 370 U.S. 294, 314, 82 S.Ct. 1502, 1518, 8 L.Ed.2d 510 (1962), but chose a jurisdictional scheme in which holding companies could not be defendants.

Moreover, the issue in *United States v. American Building Maintenance Industries, supra,* the case on which JWC relies, was whether the activities of an acquired janitorial services business, operating intrastate but affecting commerce, satisfied the jurisdictional requirements of section 7. The Supreme Court held that they did not, but nowhere suggested what JWC would have us hold here—that the corporate veil of a holding company can become an impregnable shield against section 7 actions.[6] To approve such a hard-and-fast rule would be to deny the commercial realities of the day, and to place some of the nation's largest corporations beyond section 7's important control on acquisitive corporate behavior in our national marketplace.[7]

---

5. We have some doubt that this inquiry is truly necessary. There is nothing in the statute requiring that the acquiring corporation be named defendant in a section 7 action; nor, in turn, is there any language requiring that the defendant be engaged in interstate commerce. Since, here, an acquiring corporation, Celotex, and the acquired corporation, Panacon, were admittedly each engaged in interstate commerce, it may be that the jurisdictional requirements of section 7 would be met even were we to find that JWC was not engaged in interstate commerce. We do not, however, have to face this issue, since we find that JWC was engaged in interstate commerce.

6. JWC would apparently argue that jurisdiction can always be obtained over an acquiring subsidiary such as Celotex. The FTC answers that

JWC could have made Panacon an independent subsidiary, in which case Celotex would not have been an acquiring corporation. JWC, in turn, responds that Celotex would still have been an acquiring corporation, albeit indirectly. But had each of JWC's plants been separately incorporated, or had Celotex been an intrastate corporation, JWC's strained response would still not permit jurisdiction.

7. Large holding companies, such as JWC, cannot seriously contend that they are among the "local businesses [whose regulation has] heretofore traditionally [been] left to local custom or local law," *FTC v. Bunte Bros.,* 312 U.S. 349, 354, 61 S.Ct. 580, 583, 85 L.Ed. 881 (1962), and which Congress, by its use of the "engaged in commerce" standard, excluded from section 7's jurisdiction.

We would also be reluctant to sanction the converse proposition, *i. e.*, that a parent corporation and its subsidiaries are *always* a single entity for determining jurisdiction under section 7. Such a holding is not, however, required here. JWC was, as the FTC found, actively involved in the management of its subsidiaries, and, in this situation, we have no difficulty concluding that it was engaged in interstate commerce.

**B**

 JWC raises a second jurisdictional objection: that the FTC lacked jurisdiction because Celotex was an unjoined, indispensable party to the proceedings. The issue of a party's indispensability, however, is not jurisdictional. *See* 3A Moore's Federal Practice ¶ 19.19 (1979). Thus, we have held that a court may retain jurisdiction over an action in which an indispensable party has not been joined, although recognizing that joinder must be made before a decision can be entered. *Moore v. Knowles*, 482 F.2d 1069 (5th Cir. 1973).

Because the issue of Celotex's indispensability is not jurisdictional and because the issue would be mooted on remand if the FTC provides Celotex a meaningful opportunity to participate in the hearings, we do not resolve it here.

**III**

**A**

Section 7 prohibits acquisitions "where in any line of commerce *in any section of the country*, the effect of [the] acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18 (1976) (emphasis added). Accordingly, "Determination of the relevant . . . geographic [market] is 'a necessary predicate' to deciding whether a merger contravenes the Clayton Act." *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 618, 94 S.Ct. 2856, 2868, 41 L.Ed.2d 978 (1974). The FTC found that the relevant geographic market in this case was "the nation as a whole." Record at 1561.

In our review of the FTC's finding, we must bear in mind that "[t]he findings of the commission or board as to the facts, if supported by substantial evidence, shall be conclusive." 15 U.S.C. § 21(c). The substantial evidence rule, however, must be applied within the context of the definition of the statutory phrase "any section of the country," which JWC argues is "the area in which the goods or services at issue are marketed to a significant degree by the acquired firm." *United States v. Marine Bancorporation, Inc., supra* at 619–21, 94 S.Ct. at 2869. Since Panacon marketed 93% of its roofing products in 26 states, JWC claims that the finding of a national market was incorrect as a matter of law.

The FTC takes the position that *Marine Bancorporation* is applicable only in cases involving either a highly regulated local industry, such as the banking industry, or potential competition. In other cases, significant marketing by the acquired corporation is not necessary to define a national market. For support of its position, the FTC directs our attention to *RSR Corp. v. FTC*, 602 F.2d 1317 (9th Cir. 1979), *cert. denied*, 445 U.S. 927, 100 S.Ct. 1313, 63 L.Ed.2d 760 (1980).

There, RSR, the nation's second largest producer of secondary lead, appealed from an FTC decision holding that its acquisition of the fifth largest producer violated section 7. RSR argued that because the acquired corporation sold its products in only one third of the nation, the national market finding was incorrect as a matter of law under *Marine Bancorporation*, the same theory JWC advances here. The Ninth Circuit disagreed, and held that the FTC's finding was supported by "evidence of pricing interdependence nationwide and evidence of the ability of secondary producers to ship lead into states in which most secondary lead is consumed. . . ." 602 F.2d at 1323. *Marine Bancorporation* was distinguished because it "involved the heavily-regulated banking industry." *Id.* at 1323–24.

Although we think the result in *RSR* is correct, we do not agree with all the Ninth Circuit's reasoning and think two issues must be resolved before we can determine whether the FTC's finding of a national asphalt roofing product market is supported by substantial evidence: first, determination of the correct legal standard for defining a geographic market; and, second, the factual predicate that must be proved under that standard to support a finding of a national market. Hence, we proceed to a consideration of judicial cartography and section 7 geographic markets.

■ Our consideration begins with *Marine Bancorporation*, which we think was incorrectly distinguished in *RSR* as being relevant only to the highly regulated banking industry. But this does not mean we share JWC's view that *Marine Bancorporation* requires a geographic market to be delineated by the geographic loci at which the acquired firm markets its goods or services. Such a definition of geographic market would be inconsistent with the intent of Congress that "although the section of the country . . . will normally be one in which the acquired company or the acquiring company does business, [section 7, as amended] is broad enough to cope with a substantial lessening of competition in any other section of the country as well." S.Rep.No.1775, 81st Cong., 2d Sess. 5–6, reprinted in [1950] U.S.Code Cong.Serv. 1950, pp. 4293, 4298.

■ The language from *Marine Bancorporation* defining geographic market reads as follows:

Without exception the Court has treated . . . 'relevant geographic market' . . . as the area in which the goods or services at issue are marketed to a significant degree . . . [I]n no previous § 7 case has the Court determined the legality of a merger by measuring its effects on areas where the acquired firm is not a direct competitor.

418 U.S. at 619–21, 94 S.Ct. 2869–70. This passage should, we believe, be read as say-

ing that the relevant geographic market is the area of the country in which the acquired firm is a significant competitor. Such an approach recognizes that "it is the preservation of competition which is at stake, [and thus] the significant proportion of coverage is that within the area of effective competition." *Standard Oil Co. of California v. United States*, 337 U.S. 293, 299, n.5, 69 S.Ct. 1051, 1055, n.5, 93 L.Ed. 1371 (1949) (action under Section 3 of the Clayton Act).

■ We think that in surveying the boundaries of this area of effective competition in a particular case, the FTC may generally use either of two approaches. First, it may define the area by the points at which the acquired firm makes significant sales, the approach JWC argues it must take in every case. But second, the FTC may choose to define a relevant market by identifying the area in which the acquired firm's marketing activities have a perceptible competitive impact on the activities of other firms in the same area. As one court has observed,

the geographic market for the purposes of determining the impact of a merger can include all areas where the trade in a product is affected by, and is not independent of, the trade in that product in other areas . . . . .

*United States v. Bethlehem Steel Corp.*, 168 F.Supp. 576, 599–600 (S.D.N.Y.1958). This second approach is the one we think the Ninth Circuit used in *RSR*, and the one the FTC suggests is appropriate here.

■ We agree with the FTC, and that brings us to our second market issue, the evidentiary predicate needed under the second approach to support a finding that the entire United States is an area of effective competition for asphalt roofing products. Certainly the most compelling evidence that an area is competitively unified is statistical evidence of pricing interdependence, *i. e.*, "if a change in price in one area has an effect on price in another area." *Id.* at 600.[8] But we think non-statistical evi-

---

8. In *RSR*, the FTC found that "There is one national published price for lead, with frequent

discounting throughout the country. The size of regional discounts, however, is likely to re-

dence can also be probative of a national market, if it tends to show that "regional markets are so interrelated that what happens in one has a direct effect in the others and none is so separate that the buyers and sellers are not concerned with prices and supply and demand in the others." *Id.* at 600.

### B

■ We now turn to whether there is substantial evidence to support the FTC's finding of a national market for tar and asphalt roofing products. "Substantial evidence is evidence that provides 'a substantial basis of fact from which the fact in issue can be reasonably inferred . . . more than a scintilla . . . more than create a suspicion . . . such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Diamond M. Drilling Co. v. Marshall*, 577 F.2d 1003, 1006 (5th Cir. 1978), *quoting NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 299–300, 59 S.Ct. 501, 505, 83 L.Ed. 660 (1939).

In this case, the FTC appears to have relied primarily on the casual observations of industry representatives and an economist, to the effect that large firms compete nationally. None of these individuals, however, was responding to questions relating to the legal standard for defining a geographic market. Other than this opinion testimony, which composes approxi-

mately three pages out of the 2,686 page transcript, the only evidence even slightly probative of a national market showed that some producers of asphalt roofing shipped some of their products beyond ·a 250 mile radius of their plants, that factors in addition to transportation costs affected the distance products could be shipped, and that more than half of all tar and asphalt sales were made in the 26-state region where Philip Carey was most active. We do not think, given the definition of geographic market outlined in this opinion, that this is substantial evidence of a national market.

### IV

Because of our holding that the FTC's national market finding is not supported by substantial evidence, we remand for reconsideration of the appropriate geographic market by which the merger of Panacon into Celotex must be judged.

■ In addition to the two issues we have discussed, JWC raises objections to the FTC's findings that the appropriate product market is limited to tar and asphalt roofing products and that the merger had anti-competitive effects. JWC also argues that the divestiture remedy was overbroad and in violation of the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321–4347 (1976).[9] Each of these issues would have to be reconsidered, however, if a regional market rather than national market were found.[10] Therefore, we reserve our judg-

---

spond quickly to competitive conditions in neighboring regions." *RSR Corporation*, [1976 79 Transfer Binder] TRADE REG. REP. (CCH) ' 21,252, at 21,152 (1976).

9. JWC's challenge under NEPA is that the FTC failed to prepare an environmental impact statement on the effect of its order to divest Panacon's tar and asphalt roofing operations in a sale to a single purchaser. We observe, however, that a mere change in ownership of several industrial plants would not seem to have the type of effect on the environment that requires preparation of an impact statement, notwithstanding JWC's representation that it may choose to sell to a notorious polluter.

10. *Product line*: While tar and asphalt roofing products may be a distinct product line nation-

ally, it may be that in some regional markets other roofing products may be part of the same product line.

*Anticompetitive Effects*: The concentration ratios the FTC relied upon were those of the top two and top eight producers nationally. While the concentration ratio of the top two firms would of course still be substantially increased in any regional market, the increase of the top eight firms may be only marginally increased. Also, the nonstatistical considerations relating to anticompetitive effects may be different for regional and national markets.

*Remedy*: Divestiture to several producers may be appropriate in a regional market and not in a national market. Moreover, considerations that prompted the FTC to order divestiture of Carey-Canadian Mines and the Eliza-

ment on these questions, which JWC may raise after the FTC has reconsidered the case at the administrative level. Moreover, we think the FTC should have the opportunity to reconsider these issues [11] *sua sponte*, particularly if it allows Celotex an opportunity to participate in the proceedings.

We therefore vacate the FTC decision and remand the case for reconsideration in light of this opinion.

VACATED and REMANDED.

bethtown plant may not be present in a regional market.

11. The FTC record strongly suggests that the FTC did not fully consider JWC's argument that the ALJ's proposed remedy should not have been modified to require divestiture of the Elizabethtown plant and Carey-Canadian. We think the objections are sufficiently serious to warrant closer attention than was given.