**COMMUNITY PUBLISHERS, INC.; and Shearin Inc. d/b/a Shearin & Company Realtors, Plaintiffs,**

v.

**DONREY CORP. d/b/a Donrey Media Group; Nat, L.C.; Thomson Newspapers, Inc.; and The Northwest Arkansas Times, Defendants.**

Civ. No. 95–5026.

United States District Court, W.D. Arkansas, Fayetteville Division.

March 30, 1995.

Philip S. Anderson, Peter G. Kumpe, J. Leon Holmes, Jeanne L. Seewald, Williams and Anderson, Little Rock, AR, Tom Burke, Burke & Eldridge, Fayetteville, AR, for Community Publishers, Shearin Inc.

Jerry C. Jones, Kenneth Shemin, Amy Lee Stewart and Grant Fortson, Rose Law Firm, Little Rock, AR, James M. Dunn, Warner, Smith & Harris, Fort Smith, AR, Woody Bassett, Bassett Law Firm, Fayetteville, AR, for Donrey Media Group.

William J. Butt, Timothy E. Howell, Davis, Cox & Wright, Fayetteville, AR, for Thomson Newspapers.

### *AMENDED MEMORANDUM OPINION*

H. FRANKLIN WATERS, Chief Judge.

This is an antitrust case in which plaintiffs are challenging the purchase of a daily newspaper, the *Northwest Arkansas Times* (the "*Times*"), by NAT, L.C. ("NAT"). Plaintiffs contend that NAT's purchase of the *Times* is illegal under the antitrust laws, due to the fact that NAT has significant shareholders in common with defendant D.R. Partners d/b/a Donrey Media Group ("Donrey"). Donrey owns a competing newspaper, the *Morning News of Northwest Arkansas.*

Plaintiffs claim that plaintiffs are violating or threaten to violate §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and §§ 7 and 8 of the Clayton Act, 15 U.S.C. §§ 18 and 19. Plaintiffs seek injunctive relief under § 16 of the Clayton Act, 15 U.S.C. § 26.

Defendant Donrey has filed a motion to dismiss on the grounds that no claim for relief has been stated against it. In support of its motion, Donrey argues that plaintiffs have not alleged that Donrey owns the *Times* so that Donrey cannot be ordered to divest itself. Rather, any such divestiture order would be directed at NAT. Also, plaintiffs have not alleged that Donrey is seeking to purchase the *Times* so Donrey need not be enjoined from such a purchase. As no relief is available against it, contends Donrey, it must be dismissed from the suit.

Donrey's motion will be denied. In dealing with the issues raised by Donrey's motion to dismiss, the court has found it necessary to rely on information outside the pleadings, and has, therefore, converted this motion into one for summary judgment pursuant to Rule 12(b) of the Federal Rules of Civil Procedure. As required by Rule 12(b), the parties have been given an opportunity to supplement their papers and the court is now ready to rule.

## I. SECTION 7 OF THE CLAYTON ACT

Plaintiffs have stated a claim under Section 7 of the Clayton Act, 15 U.S.C. § 18, which provides that no person shall acquire, "directly or indirectly," the whole or part of the stock or other share capital of a person, where the effect of such acquisition may be to substantially lessen competition or tend toward monopoly.

Specifically, the Section 7 claim is that Donrey *indirectly* acquired *Times* stock through NAT and must be enjoined from doing so in the future. First of all, NAT and Donrey have substantially overlapping ownership. Ninety-nine percent (99%) of Donrey stock is owned by Stephens Group, Inc. ("SGI"). SGI's stock, in turn, is owned en-

tirely by trusts held by the Stephens family.[1] In comparison, NAT's ownership is substantially the same as the ownership of SGI. Ninety-five and one-half percent (95½%) of NAT is owned by the same family trusts that own SGI, although they own NAT in different proportions than they own SGI.[2] The chairman of all three corporations (Donrey, SGI, and NAT) is Jack Stephens, a member of the Stephens family.

In addition to the common ownership of NAT and Donrey, it currently appears that both SGI and Donrey were seriously involved with the process leading up to NAT's acquisition of the *Times,* and that a NAT acquisition of the *Times* was a conscious substitute for a Donrey acquisition. On or about January 19, 1995, Thomson Newspapers publicly announced that it was selling the *Times* and twenty-four (24) other newspapers. NAT was formed on January 30, 1995, for the specific purpose of acquiring the *Times.* On February 6, 1995, Thomson closed the sale of the *Times* to NAT. Key SGI and Donrey personnel were involved in the negotiations leading up to this sale, including Jack Stephens (Chairman of SGI, Donrey and NAT), Scott Ford (Assistant to Chairman of SGI), Darrel Loftin (Chief Financial Officer of Donrey), and Emmett Jones (President and Chief Operating Officer of Donrey). In fact, according to Thomson's Chief Financial Officer, SGI and Donrey had previously attempted to negotiate a direct *Donrey* purchase of the *Times* as early as the Fall of 1994. (Pls.Resp.Mot.Dism., Ex. 2, Depo. of Robert Daleo at pp. 16–18, 29–31). Furthermore, Jack Stephens, Scott Ford, Emmett Jones and Darrel Loftin were all aware of the possibility that antitrust laws might apply to a Donrey acquisition of the *Times,* including the possibility that they might have to file a notice with the Federal Trade Commission under the Hart–Scott–Rodino Act, 15 U.S.C. § 18a, to get such a transaction approved

under the antitrust laws. (Pls.Resp.Mot.Dism., Ex. 6, Depo. of Emmett Jones at pp. 93–96; Ex. 8, Depo. of Darrel Loftin at p. 26).

Although the court can find no precedent with identical facts, the court believes that a claim has been stated under Section 7 as to whether Donrey indirectly acquired the *Times* through NAT. It is clear that an indirect acquisition can take various forms, including acquisition by a subsidiary or affiliate. The House Committee Report on the bill that eventually became amended Section 7 is explicit on this point. It states that Section 7 "forbids not only direct acquisitions but also indirect acquisitions, whether through a subsidiary or an affiliate *or otherwise.*" H.R.Rep. No. 1191, 81st Cong. 1st Sess. 9 (1949) (emphasis added), *quoted by,* Julian O. von Kalinowski, 3 *Antitrust Laws & Trade Regulation* § 24.06 (1994).

The inclusion of the catch-all phrase "or otherwise" in the legislative history is very telling, as it indicates that the term "indirectly" must be broadly interpreted, lest persons and firms manipulate corporate structures in order to avoid the appearance of direct acquisition. This case provides a perfect example of the fluidity of corporate forms and the potential dangers they present. Donrey and NAT essentially share a common genetic imprint, i.e., ownership by various Stephens family trusts. Such a corporate "cloning" procedure should not be allowed to create large loopholes in Section 7. Although there is no common parent in the sense of a single legal entity that owns both subsidiaries, there is certainly a claim concerning whether or not Donrey and NAT are actually affiliated corporations.

The above discussion indicates that the term "directly or indirectly" should be interpreted as broadly as necessary to accomplish the purposes of the antitrust laws, and the cases have held accordingly. In varying con-

---

1. **Ownership of SGI:**

    40% J.T. Stephens Trust One
    40% Bess Stephens Trust
    10% Warren A. Stephens Trust
    3.3% W.R. Stephens Jr. Rev. Trust
    3.3% Pamela Stephens Rose Trust One
    3.4% Elizabeth Ann Stephens Campbell Rev. Trust One

2. **Ownership of NAT**

    12.075% J.T. Stephens Trust One
    12.075% Bess Stephens Trust
    35.675% Warren A. Stephens Trust
    11.892% W.R. Stephens Jr. Rev. Trust
    11.892% Pamela Stephens Rose Trust One
    11.892% Elizabeth Ann Stephens Campbell Rev. Trust One

texts, the courts have refused to take a formalistic approach to corporate structures in order to effectively implement the antitrust laws. For example, in *Consolidated Gold Fields PLC v. Minorco, S.A.*, 871 F.2d 252 (2d Cir.), *cert. dism'd*, 492 U.S. 939, 110 S.Ct. 29, 106 L.Ed.2d 639 (1989), a firm called Minorco sought to acquire the stock of a competing firm called Gold Fields. In calculating Minorco's market share to evaluate the legality of the acquisition, the district court included the market shares of various competing entities owned, not by Minorco, but by Minorco's owners. Although an independent corporation, Minorco was owned by two firms, Anglo and De Beers, and by the Oppenheimer family. The Second Circuit upheld the district court's approach.

> c. *Attribution of Market Share to Minorco.* Minorco also contends that the District Court erred in attributing to Minorco the power of the Oppenheimer family and Anglo in the gold market. [Minorco] contends that there was no evidence that Minorco was dominated or controlled by outside entities and that the District Court should have respected Minorco's separate corporate existence. Despite [Minorco's] assertions, we think the evidence in the record adequately supports Judge Mukasey's conclusion that the intertwined relationships among Anglo, De Beers, Minorco, and the Oppenheimer family warrant attribution of aggregate market power to Minorco.

*Id.* 871 F.2d at 261. *Minorco* is very similar to the present case, and the court believes that the "intertwined relationships" among the Donrey, NAT and their shareholders raises a question as to whether a direct acquisition by NAT would be an indirect acquisition by Donrey for purposes of Section 7.

Another case that illustrates the principle that corporate forms should not be used to flout the antitrust laws is *Jim Walter Corp. v. F.T.C.*, 625 F.2d 676 (1980). In *JWC*, the court found that the FTC had jurisdiction over JWC under Section 7 of the Clayton Act. JWC had argued that it was not engaged in interstate commerce because it did not conduct any commercial activities except

through its subsidiary, Celotex, and the commercial activity of the subsidiary cannot be imputed to the parent. The court rejected this argument because it would elevate corporate form over "commercial realities" and flout the purposes of the antitrust laws.

> First of all, the original section 7 "was designed primarily to deal with the evil of the secret acquisition by one corporation of the stock of another corporation, principally those acquisitions by 'holding companies.'" *United States v. Celanese Corp. of Am.*, 91 F.Supp. 14, 17 (S.D.N.Y.1950). It is illogical to suggest that Congress directed section 7 "primarily at the development of holding companies," *Brown Shoe Co. v. United States*, 370 U.S. 294, 314, 82 S.Ct. 1502, 1518, 8 L.Ed.2d 510 (1962), but chose a jurisdictional scheme in which holding companies could not be defendants.

> \*     \*     \*     \*     \*     \*

> [We thus refuse to hold that] the corporate veil of a holding company can become an impregnable shield against section 7 actions. To approve such a hard-and-fast rule would be to deny the commercial realities of the day, and to place some of the nations's largest corporations beyond section 7's important control on acquisitive behavior in our national marketplace.

*Id.* 625 F.2d at 680.

Another instructive case is *Minpeco, S.A. v. Hunt*, 718 F.Supp. 168 (S.D.N.Y.1989), where three companies with wholly separate ownerships were treated as having a single, aggregated market share. The court reasoned that the three companies had pursued a course of "joint action" and "conspiracy" to attain monopoly power. *Id.* at 172–173. To justify its holding, the court cited to three other cases, including *Minorco, supra*, which the court considered to be a comparable, rather than identical, case.

The common strand in these cases is the refusal to allow corporate forms to be used as a tool to flout antitrust laws. One final case that illustrates this principle is *United States v. Tidewater Marine Serv., Inc.*, 284 F.Supp. 324 (E.D.La.1968), where a firm called Tidewater sought to acquire the stock of a firm called Twenty Grand, which in turn

142

owned 50% of the stock of a firm called Twenty Grand Pacific. In determining the relevant geographic market, the court held it was necessary to use the area covered by both Tidewater and Twenty Grand Pacific.

> In so holding, we reject the defendants' contention that the West Coast is not a relevant geographical market, which contention is based on the fact that Twenty Grand operates its West Coast chartering business through Twenty Grand Pacific, a corporation 50% owned by Twenty Grand and 50% owned by an individual named Kenneth Elmes. The very terms of § 7 defeat this argument since the Act proscribes the acquisition "directly or *indirectly* [of] the whole or *any part of the stock* " (emphasis added) of another corporation if the effect may substantially lessen competition in any section of the country. Thus, the fact that Twenty Grand Pacific is only 50% owned by Twenty Grand is irrelevant inasmuch as Tidewater will acquire 50% ownership of Twenty Grand Pacific through the acquisition of Twenty Grand's stock.

*Id.* 284 F.Supp. at 332 (all editorial enhancements in original) (footnote omitted).

Once again, the basic principle of these cases is that formal corporate structures should not be used as a tool to flout the antitrust laws. Of course, there is no end to the possible factual situations to which this principle must be applied, because there is no end to the ways in which corporate structures can be manipulated. As such, the court is not bothered that there is no direct precedent dealing with identical facts. The court thus concludes that plaintiffs have stated a cause of action against Donrey, because available precedent dictates a pragmatic interpretation of the term "indirect acquisition" that preserves the force of Section 7 of the Clayton Act.[3] *See generally* Julian O. von Kalinowski, 3 *Antitrust Laws & Trade Regulation* § 24.06 (1994).

---

**3.** Section 7 of the Clayton Act is the principal antitrust statute applicable to mergers and acquisitions. Julian O. von Kalinowski, 3 *Antitrust Laws & Trade Regulation* § 23.01 (1994). However, Sections 1 and 2 of the Sherman Act are

## II. SECTION 8 OF CLAYTON ACT

The court also notes that plaintiffs have alleged a cause of action against Donrey under Section 8 of the Clayton Act, 15 U.S.C. § 19, which prohibits interlocking directorates and officers, where such interlocking may substantially lessen competition or tend toward monopoly. Even if NAT's purchase of the *Times* is upheld, this cause of action may be available. Although by its terms, Section 8 appears to apply only to persons who simultaneously serve as directors in competing corporations, virtually all cases instituted under the statute to date have also named the interlocked corporations as defendants. In recent years, several district court, appellate court and FTC decisions have resolved that corporations can indeed be held liable and enjoined under Section 8. *See* Earl W. Kintner, Volume V *Federal Antitrust Law* § 42.13 (1984).

## III. REMEDIAL CONSIDERATIONS

As a further grounds for keeping Donrey in this suit, the cases are clear that the court has broad powers in equity to fashion such relief as is necessary to remedy the antitrust violations at hand and to prevent future violations. *See e.g. California v. American Stores Co.*, 495 U.S. 271, 294, 110 S.Ct. 1853, 1865, 109 L.Ed.2d 240 (1990). The court believes that if it is appropriate to grant prospective relief, this may necessarily include Donrey, which should accordingly be kept in the suit.

## IV. CONCLUSION

For the above stated reasons, Donrey's motion to dismiss will be denied in its entirety. A conforming order will be entered by the court.

---

applicable as well. *Id.* at § 23.01[1], [2]. This motion, however, is not the proper time or place for delineating the substantive differences that may exist, or not, under the different sections.