CABLE HOLDINGS OF GEORGIA, INC., d/b/a Smyrna Cable TV, Plaintiff,

v.

HOME VIDEO, INC.; Wometco Cable TV of Georgia, Inc.; S.M. Landress, Defendants.

WOMETCO CABLE TV OF GEORGIA, INC., Defendant & Third-Party Plaintiff,

v.

Lloyd Gerald CROWE, Third-Party Defendant.

Lloyd Gerald CROWE, Fourth-Party Plaintiff,

v.

Richard TREIBICK, Fourth-Party Defendant.

Civ. A. No. C80–1692A.

United States District Court, N.D. Georgia, Atlanta Division.

Sept. 16, 1983.

J.A. Cochran, Cochran, Camp, Snipes & Davis, Smyrna, Ga., Howard Graff, Nemeroff, Jelline, Danzig Graff, Mandel & Bloch, New York City, for plaintiff.

Eugene G. Partain, Powell, Goldstein, Frazer & Murphy, John A. Pickens, Stephen E. O'Day, Hurt, Richardson, Garner, Todd & Cadenhead, Atlanta, Ga., S.M. Landress, Marietta, Ga., for defendants.

Richard D. Elliott and Michael A. Dailey, Atlanta, Ga., for Treibick.

## ORDER

FORRESTER, District Judge.

The complaint in this action was filed September 29, 1980 and was amended on December 23, 1980, alleging violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2 and of Section 7 of the Clayton Act, 15 U.S.C. § 18. After extensive discovery, defendant Wometco has filed a motion for summary judgment on plaintiff Cable Holdings' claims against it. The motion, with plaintiff's opposition thereto, is before the court.

### I.

The parties have each filed statements of material facts as to which they contend there is no genuine issue to be tried. In the last three pages of plaintiff's statement were numbered statements corresponding to Wometco's statement of material facts as to which plaintiff contends there exists a genuine issue to be tried, as required by Local Court Rule 91.72. Accordingly, Cable Holdings' motion for consideration of this court's order of March 17, 1983 is GRANTED.

Cable Holdings has also filed, in response to Wometco's statement of material facts as to which it contends there is no genuine issue to be tried, a series of objections. Many of these objections are made on the grounds that plaintiff's statements mischaracterize the evidence or are unspecific and unsupported by citations to the record and to admissible evidence or are conclusory. Wometco also objects to many of plaintiff's

statements on the grounds that they are not relevant or material to the issues raised by Wometco's motion. It objects particularly to Cable Holdings' statements regarding Wometco's allegedly anticompetitive acts. Cable Holdings objects on materiality and relevancy grounds to Wometco's statements regarding Cable Holdings' efforts to acquire cable companies in Cobb County which were eventually acquired by Wometco. These specific objections are indicative of the parties' opposing characterizations of this case—Cable Holdings characterizes Wometco's actions as part of a predatory, anticompetitive scheme to force all other cable companies out of the Cobb County market and is therefore providing the basis for an antitrust action. Wometco characterizes this action as unsuited for resolution under the antitrust laws, being an action by a disappointed suitor.

The court will consider those facts which are material to the specific issues presented by this summary judgment motion. In addition, the court will not consider materials whose admissibility at trial is disputed by the parties. See 6 Moore's ¶ 56.11 at 56–197 to 209.

## II.

### THE FACTUAL RECORD

Cable Holdings and Wometco are cable companies which operate in Cobb County. Within the unincorporated areas of Cobb County, any company desiring to provide cable television services to residential dwellings must have a franchise from the Cobb County Commission in order to operate. Similarly, any person or company desiring to provide such services within the city limits of Marietta must have a franchise from the appropriate city council. All franchises for the provision of cable television services awarded by Cobb County, Smyrna or Marietta are non-exclusive.

In 1978 the Cobb County Commission and the Smyrna City Council granted the plaintiff permission to acquire the assets, including franchises, of Jones Intercable. On January 9, 1979 the Cobb County Commission awarded a franchise to Home Video, Inc. for certain unincorporated areas of Cobb County.

In late 1979 or early 1980, both Cable Holdings and Wometco learned that the principals of Home Video were interested in selling the assets of the company. Both parties actively sought to acquire Home Video. The principals of Home Video sold the assets of the company to Wometco. The closing date for the purchase of the assets of Home Video by Wometco was April 1, 1980. The assets of Satellite Cable TV became available. Wometco acquired those assets. Plaintiff made some efforts to acquire Satellite, but the deposition testimony is somewhat conflicting regarding the scope of those efforts.

In the spring of 1980 the plaintiff applied to the Cobb County Commission for a franchise to operate in an area of Cobb County adjacent to the western border of the area within which it had been operating. The territory sought by that application encompassed a large portion of the territory for which Home Video had been granted a franchise in January, 1979. Plaintiff's expansion into this territory, the "Western Territory," was a natural expansion of its current system. It planned to utilize the same head end and administration facilities. Many of its contracts (e.g., with suppliers and sources for programming) and business relationships would also be applicable to the Western Territory. Through its affiliates, plaintiff had expended $4–$5 million dollars on construction of its system in Cobb County and had more than sufficient resources to expand that system and construct and operate a cable television system in the Western Territory.

Upon learning of plaintiff's application to expand its franchised area, the defendants embarked upon a joint effort to frustrate plaintiff's efforts to do so. Accordingly, at the Cobb County Commission's regular meeting in April, 1980, Wometco opposed the franchise application through S.M. Landress, who had been the president of Home Video. Wometco successfully delayed the consideration of plaintiff's application to

expand its franchised area, since the Cobb County Commission tabled the plaintiff's application. At its May, 1980 meeting the Commission granted the application. At that May meeting the Cobb County Commission also imposed a six-month moratorium on new franchise applications from cable television companies. Hence, the plaintiff, by virtue of its new franchise, and Wometco, by virtue of its acquisition of Home Video, were both licensed to service Cobb County residents in the Western Territory.

Plaintiff contracted with National Engineering Enterprises to prepare the strand maps for the Western Territory, which were completed in November and December of 1980, having been ordered roughly two to three months previously. The plaintiff ordered some equipment in November, 1980, which was received shortly after January 31, 1981. After the strand maps were received, the plaintiff did not proceed with the detailed design work, did not ride the territory with utility representatives, and did not engage a contractor to install any cable in the Western Territory. (Deposition of Berhman, chief engineer for Cable Holdings). According to Treibick, plaintiff had bought "pretty much" all the equipment needed for construction in the Western Territory.

On or about July 18, 1980, Wometco, together with S.M. Landress, whom Wometco had retained as counsel (although the precise role of Mr. Landress is unclear), threatened suit against the plaintiff to prevent it from developing a cable system in the Western Territory by a letter from Landress to the plaintiff. The letter asserts that plaintiff's application for a franchise for the Western Territory violated an agreement between Home Video and plaintiff under which plaintiff purportedly agreed not to construct, operate or apply for a franchise in Cobb County west of a certain defined line. On September 11, 1980 Mr. Landress, upon Wometco's consent or instruction, instituted a suit on behalf of Wometco (as Home Video's alleged "successor") and Home Video in the Superior Court of Cobb County styled *Home Video, Inc. and Wometco Cable TV of Georgia, Inc. v. Cable Holdings of Georgia, d/b/a Smyrna Cable TV.* The complaint was signed by S.M. Landress as "Attorney for Plaintiff." No hearing was ever held in that case, no injunction of any sort was ever issued in that case, and the suit was dismissed on November 21, 1980. Counterclaiming against plaintiff in this action, on November 24, 1980 Wometco asserted the claim pled in the Cobb County suit regarding the enforceability of the alleged agreement.[1] This counterclaim was dismissed without prejudice and with Cable Holdings' consent.

## CABLE HOLDINGS' READINESS TO EXPAND

In his deposition Richard Treibick, the president of Cable Holdings, testified that a "cloud [had been] passed on your [Cable Holdings'] borrowing ability by the law suit that was filed in Cobb County." He said,

If we had been allowed to build the western area of Cobb County without your interference, then today we would have more subscribers and we would have a more viable company, which means we would be able to borrow more money if we so chose to do so.

Since you have prohibited us, we haven't been able to do that. To that degree, since it affects our entire company, you have damaged our ability to borrow money.

The answer is simply we could not have sought to borrow any money in a situation that was clouded like that.

In response to the question "Had Wometco Cable TV of Georgia, Inc. prohibited you from building in Cobb County, would you

1. In answers filed on behalf of himself and Home Video in this suit, Mr. Landress denied entering any negotiations whereby he or Home Video would attempt to preclude Cable Holdings from operating a cable system west of any defined boundaries and denied entering into any agreement with the plaintiff having future and collateral implications. Wometco has filed a cross-claim in this action against Mr. Landress.

describe how Wometco Cable TV of Georgia, Inc. did that?", Treibick answered,

> Went to court and sought an injunction alleging all kinds of nonsense and planting a question in our minds and in obviously the minds of anybody we do business with, including our banks. Had that situation been brought to the attention to the banks, I think they would have been concerned. We did not choose to do that at the time. We could make that decision.

He then asked, "How did that prohibit you from building in the western part of Cobb County?"

> It's a business judgment. If there were too many obstacles—the building in the western portion of Cobb County takes two years, which is approximately what we are talking about, and it was a problematical thing to begin with, in so far as we were building really in an area which is not yet completely developed and therefore the saturations would be very low.
>
> And so you have to add up all these things in your mind and say, "Why am I going to build to begin with?" Every indication we have from the county planning board, discussions with various people in Cobb County, indicates that major growth that will take place in that area over the next ten years, so really you're investing for the future in a situation like that.
>
> And if you consider, and I am not using this term as being the amount of money because I don't know off hand, but let's assume you are considering to invest a million dollars in that area and you were looking for an ultimate return on your investment at some point in time, you have to look at the liabilities or the negative sides of it:
>
> 1. The area was not going to develop fast. You would be sitting there for a long time waiting. The second is the availability of alternatives they may have had there. There are several things that go into a judgment to decide to build in an area or not. When you add them all up let's assume you have a balance, and with five or ten questions you address to yourself as to why are you going to do it and five are negative and five are affirmative, and that you have gone into court and then you have to spend several hundred dollars in your judgment defending a law suit, and then you sort of have this feeling your competitor, the person that has done that, is not exactly being very ethical about the whole thing. And then you decide maybe this is something you would not do until you get the whole thing up [sic].
>
> So to that degree—in assuming you are faced with a situation: you are driving down a road and you want to go the north [sic] or to the south, and there are two routes to get there, and one is strewn with hazards and obstructions and one is not, I think you would tend to go down the one that is not.
>
> I think what happened here, Wometco Cable TV of Georgia, Inc. successfully strewed the road with obstructions and hazards and things sufficient for us to determine that it was something we could not do at the time.

Q: What prohibits you from building in the western part of Cobb County today?

A: For one thing, the law suit still overhangs our head. Your onerous and objectionable law suit still hangs over our head today.

Q: How is that?

A: You withdrew it. You can reinstitute that—you withdrew it for your own purposes and clearly gained no benefit out of it after we had expended the funds and time to defend ourselves and you withdrew it.

You did not withdraw it in such a way as to preclude you from reentering the law suit, so this same cloud hangs there today as it did before.

. . . . .

Q: Is there anyone else in your organization who might know what prohibits Cable Holdings of Georgia from building in the western part of Cobb County?

. . . . .

A: There is nobody else here that makes that judgment except me, and I will try to answer for you as best I can.

To say that the first and major obstacle is the existence of the law suit, and secondly, today you have a totally different market place than you did two years ago. You have a cable operator who has totally cabled the area, and we would be going head against head, not on an equal basis, because he has already been there for two years.

You have all kinds of building and construction problems. Your client has succeeded in what he set out to do and what he demonstrated he would do, which was to impede us from getting there, and he did.

## THE ACQUISITION OF MARIETTA CABLE

The acquisition by Wometco of Marietta Cable TV, which is the subject of plaintiff's Clayton Act § 7 claims, was precipitated in mid-1980, when the owner of Marietta Cable TV decided to offer the assets of that company for sale. He was represented in this endeavor by Communications Equity Associates ("CEA"), a brokerage firm from Tampa, Florida, which specialized in the purchase and sale of cable television companies. CEA provided extensive information about Marietta Cable TV to approximately twenty different prospective buyers, all of which were given the same opportunity to visit and inspect the system and all of which had the same opportunity to acquire Marietta Cable TV by submitting a written bid on September 30, 1980. The plaintiff submitted a bid, as did Wometco. Wometco's was the winning bid. On November 25, 1980, the plaintiff obtained an ex parte temporary restraining order prohibiting Wometco from acquiring, directly or indirectly, the stock or assets of Marietta Cable TV. Counsel for the owner of Marietta Cable and Marietta Cable TV then contacted the plaintiff and/or its attorneys and offered to sell Marietta Cable TV to the plaintiff for the same amount that Wometco had bid. However, the plaintiff declined to purchase Marietta Cable TV for that sum.[2] No franchise owned and operated by Wometco in Cobb County overlaps the franchise area of Marietta Cable TV.

The affidavit of John Milton Lewis, President of Wometco Cable TV of Georgia, Inc. and President of its parent company, Wometco Cable TV, Inc. states that part of Lewis' job as president of these two companies is to investigate potential acquisitions and to make recommendations to the Board of Directors as to whether any potential acquisition would be a prudent and profitable investment. I am, therefore, familiar with the criteria used by the Wometco companies of which I am President in making the determination concerning a potential acquisition. I was intimately involved in the process which led to the acquisition of the assets of Marietta Cable TV by Wometco, and I submitted the bid of $7,250,000 for those assets on behalf of Wometco. I can state unequivocally that we would never have attempted to sell cable television services within the Marietta Cable TV franchise area through de novo entry into that franchise territory. If we could not have acquired the assets of Marietta Cable TV, we would not have attempted to obtain a franchise to operate within that area. There are a number of reasons why we would not have attempted de novo entry had we been unable to acquire the assets of Marietta Cable TV. Among these reasons are the uncertainties involved in securing the necessary franchises. There was no guarantee that any such application would be granted. There would have been some problems with securing the necessary pole attachment permits from the appropriate utility companies in the event that franchises were to be granted. The use of utility poles by two cable television operators generally means that the company which attaches its cable to the poles after the other company does faces greatly increased costs associated with that construction work.

2. Cable Holdings is not seeking any damages in this suit for Wometco's takeover of Marietta.

In addition, experience has demonstrated that the first cable company to market its services in a given area usually attracts a higher percentage of the potential subscribers (and retains those subscribers) than the second company is able to attract.

The area within which Marietta Cable TV operated was a particularly undesirable area for a second cable television company to attempt to service. The system was somewhat mature and much of the necessary construction work had already been completed by Marietta Cable TV. A second cable television operator would have had to install duplicate cable throughout the system and would have been at a very significant competitive disadvantage. Probably more important was the fact that a large percentage of the potential subscribers residing within the Marietta Cable TV franchise area lived in apartment complexes. Marietta Cable TV had entered into long-term contracts with the owners or managers of most of those apartment complexes, under the terms of which Marietta Cable TV would be the only cable television company permitted to provide services to the residents of those apartment complexes. These factors, among others, made it impossible for us to consider entering the area franchised to Marietta Cable TV by any means other than acquisition.

Had we been unable to acquire Marietta Cable TV, we had numerous, more profitable investments available for the funds which would have been required for a de novo entry. We would have used those funds for other acquisitions or for the expansion of some of our other systems throughout the United States.

Cable Holdings denies generally that Wometco would not have entered the Marietta franchise area if it had not acquired the system, and contends that there is a reasonable probability that Wometco would have entered at least in part the area encompassed by the Marietta system. Plaintiff supports this contention by pointing out several facts. First, plaintiff shows that prior to its acquisition of the Marietta system, Wometco applied for a franchise for all of Cobb County and included a program for construction for areas within the Marietta system. Although Wometco objects on evidentiary grounds to the exhibit evidencing this application submitted by the plaintiff in conjunction with its response to defendant's motion for summary judgment, Wometco does not deny that the application was made. Instead, Wometco shows that the "application was withdrawn and never acted upon by Cobb County. The application is dated May 13, 1980, and it was at the meeting of the Cobb County Commission that same day that the Commission imposed a six-month moratorium on new applications. Cheney Dep. at 305–306." Second, plaintiff shows that Cheney, the regional manager of Wometco Cable TV, Inc., considered dual franchised areas a viable alternative to acquisition of the Home Video system (January 24, 1980 Memorandum of Jerry Cheney/Wally Payne to Milton Lewis re: Cobb County Franchise). Third, plaintiff points out that Wometco operates systems in which it has overbuilt almost completely another cable franchiser (Deposition of Milton Lewis at 275–277). Wometco points out that Lewis' deposition testimony was that Wometco operates two systems which have been overbuilt by *other* cable operators. Lewis' deposition testimony also indicates that Wometco has overbuilt in small areas where it has franchise overlaps with other cable operators. Finally, plaintiff focuses on the deposition testimony of Lewis (at 170) where he described discussions regarding Wometco's strategy vis-a-vis Cable Holdings' application for additional franchise territory prior to the May 13, 1980 Cobb County Commissioners' meeting:

> Lewis: Well, at the point it became apparent that Cable Holdings was going to be awarded additional franchise territory and would be in a position to begin cherry picking the other operators in Cobb County, we felt that we would like to have that same advantage, and we, therefore, applied for a countywide franchise.

Question: What do you mean by cherry picking?

Answer: Going in and building the lucrative areas of any franchise area.

Question: And that is what you intended to do if you were awarded a franchise for all of Cobb County?

Answer: If that had been the case of operations and the way the county wanted the cable service, we would have built in that manner. You see, at this time we did not know what the county had in mind. There was talk about them just opening it up to anybody, anyone who wants a franchise, come in and get it.

In approximately January or February of 1981, soon after Wometco acquired the Marietta system, Brentwood Properties, the management of Cumberland Ridge Apartments and Riverbend Apartments, notified Charles Burgess, the manager of Marietta Cable TV, that it desired to switch service from one of these apartment complexes to Smyrna Cable TV (the record is not clear which apartment complex Brentwood wanted to switch to Smyrna; the letter from Burgess to Brentwood, *infra,* suggests that Wometco was already servicing Riverbend and was negotiating for a contract with a new complex, Cumberland Ridge. This distinction is not material to resolution of defendant's motion.). Both Riverbend and Cumberland Ridge are located within areas serviced by both Marietta (Wometco) and Smyrna (Cable Holdings). Brentwood Properties also operated Spanish Trace Apartments, a complex which was located within the Marietta (Wometco) franchise area but not within the Smyrna (Cable Holdings) franchise area.

On or about February 26, 1981 Burgess sent a letter to the management of Brentwood Properties which stated,

Enclosed please find the notice of cancellation for the free service at Spanish Trace along with the equipment list for both Riverbend and Spanish Trace. This is as per par. 4 of the Service Agreement. This is forwarded to you contingent upon the decision regarding Cable TV service for Cumberland Ridge Apartments. We are certainly willing to compromise this claim and withdraw the notice of cancellation of the free service for Spanish Trace North Apartments upon the signing of the contract to provide service for Cumberland Ridge Apartments.

Plaintiff by letter from counsel to Wometco's counsel "demanded that Wometco act forthwith to purge itself of those illegal acts which it has already committed by, including as a non-limiting example, unconditionally continuing service to Spanish Trace North Apartments and advising Brentwood Properties that service to that apartment complex will in no way be 'contingent' upon Wometco's servicing of Cumberland Ridge Apartments." Milton Lewis, the President of Wometco, rescinded the notice of cancellation of "free" basic cable TV services at the Spanish Trace Apartments and reprimanded Mr. Burgess. Plaintiff then gained the Cumberland Ridge Apartments as a bulk subscriber. Marietta Cable TV offered the identical product at both the Cumberland Ridge Apartments and the Spanish Trace Apartments prior to this incident.

## III. THE SHERMAN ACT CLAIMS

For purposes of its motion for summary judgment on the Sherman Act claims, Wometco assumes that it committed acts which constitute a violation of the Sherman Act and focuses its argument on the issue of causation, arguing that the undisputed facts show that as a matter of law those acts did not *cause* any injury to the plaintiff constituting *antitrust* injury. In addition, Wometco argues that it is entitled to judgment as a matter of law because Cable Holdings was not ready, willing and able to enter the territory which it claims it was prevented from entering by Wometco's actions.

The plaintiff in response concentrates on the acts committed by Wometco, particularly the legal claims made in the Cobb County Superior Court and in this court, arguing essentially that because of the threat of litigation, "plaintiff determined not to risk the large capital expenditure necessary to

undertake construction in the Western Territory," and that therefore, plaintiff was frustrated in its efforts to expand its cable operation. In other words, Cable Holdings argues that its antitrust injury, frustration of its efforts to expand, was caused by Wometco's anticompetitive acts. Cable Holdings argues further that the undisputed facts show that it was ready, willing and able to enter the Western Territory but was prevented from entering by Wometco's acts.

### IV.

■ In addressing the summary judgment motion of the defendant, the court is aware of the general standards to be followed in deciding such motions. The movant has the burden of demonstrating that there is no actual dispute as to any material fact in the case. In assessing whether the movant has met this burden, the court should draw all reasonable inferences about the facts in favor of the non-movant. If the record presents factual issues, the court must not decide them but must instead deny the motion and proceed to trial. Summary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the inferences that should be drawn from these facts. If reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment. *See Clemons v. Dougherty County, Georgia,* 684 F.2d 1365, 1368–69 (11th Cir.1982). In sum, it is not for the court to weigh the facts or determine the credibility of conflicting statements made by the parties.

■ Finally, although "summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles ...," *Poller v. Columbia Broadcasting,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), summary judgment is appropriate in antitrust cases where the plaintiffs, after engaging in extensive discovery, fail to produce "any sig-

nificant probative evidence in support of the allegations of their complaint." *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 289–90, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968). *See Pan-Islamic Trade Corp. v. Exxon Corp.,* 632 F.2d 539, 544 (5th Cir.1980).

■ If an issue of material fact exists, the court must deny summary judgment. However, this identical conflicting evidence mandating denial of summary judgment may support the granting of a directed verdict. *Gross v. Southern Railway Co.,* 446 F.2d 1057 (5th Cir.1971); *Sierra Club v. Callaway,* 499 F.2d 982 (5th Cir.1974). If the conflict in evidence is so slight that reasonable minds could not arrive at a contrary verdict, a directed verdict is proper although such a conflict in evidence might prevent the granting of summary judgment.

### V. SHERMAN ACT CLAIMS FOR DAMAGES

Wometco requests summary judgment on plaintiff Cable Holdings' claims for damages against it under the Sherman Act, Sections 1 and 2. For purposes of its motion for summary judgment, Wometco assumes that its actions of which plaintiff complains were anticompetitive [3] and argues that there is no evidence that these actions were the cause of antitrust injury to the plaintiff. Wometco argues that the fear of suits is but the subjective apprehension of Treibick, President of Cable Holdings, creating a self-induced causal link because of his business judgment not to enter the Western Territory in the face of possible suits by Wometco. In addition, Wometco argues, Cable Holdings was not ready, willing and able to enter the Western Territory which it claims it was prevented from entering by Wometco's actions, so it cannot claim that its non-entry was a result of Wometco's actions.

---

**3.** Wometco disclaims any reliance on the Noerr-Pennington doctrine in its motion for summary judgment, assuming that its actions in opposing the franchise and in filing the suit and counterclaim were anticompetitive.

The plaintiff argues in response that Wometco's actions directly frustrated Cable Holdings' efforts to expand its system into the Western Territory, causing it the antitrust injury of preventing entry into the market. In addition, plaintiff argues, it was prepared to enter the Western Territory by virtue of its existing and established position in the cable market and by virtue of the fact that the construction of cable in the Western Territory was a natural expansion of its existing system.

Cable Holdings focuses on three acts by Wometco which it claims caused it to be prevented from entering the Western Territory: (1) Wometco's opposition to Cable Holdings' franchise application before the Cobb County Commission in April, 1980, which delayed the granting of that franchise for one month; (2) Wometco's suit against Cable Holdings based on the alleged agreement between Home Video and Cable Holdings in September, 1980, which was dismissed in November, 1980 without there being any hearings held or injunctions issued; (3) Wometco's counterclaim against Cable Holdings in this court, which was filed on November 24, 1980 and dismissed without prejudice and with Cable Holdings' consent. While asserting that these particular actions caused it not to risk the large capital expenditure necessary to undertake construction, Cable Holdings also argues that they were part of a larger scheme to restrain trade, as evidenced by the Brentwood Properties incident, which shows Wometco's monopolistic intent.

■ Recovery may be had under the Sherman Act for a wrongfully frustrated attempt to enter a business, *see Hayes v. Solomon,* 597 F.2d 958, 973 (5th Cir.1979), or for a wrongfully impeded attempt to expand an existing business, *see Heatransfer Corp. v. Volkswagenwerk A.G.,* 553 F.2d 964 (5th Cir.1977); *see also Zenith Radio Corp. v. Hazeltine Research,* 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969). Essential to establishing that such conduct caused

the type of injury that the antitrust laws were intended to prevent[4] is (1) intention to enter the business and (2) a showing of preparedness to enter the business. *Hayes,* 597 F.2d at 973. Wometco asserts that the undisputed facts show that plaintiff was not prepared to enter the Western Territory, failing to fulfill the second of these essential elements for recovery under this theory.

Preparedness has been described as having four elements: (1) "The ability of the plaintiff to finance the business and to purchase the necessary facilities and equipment"; (2) "the consummation of contracts by the plaintiff"; (3) "affirmative action by plaintiff to enter the business"; and (4) "the background and experience of plaintiff in the prospective business." *Hayes,* 597 F.2d at 973, quoting *Martin v. Phillips Petroleum Company,* 365 F.2d 629, 633–34 (5th Cir.1966). Here it is undisputed that expansion into the Western Territory was a "natural expansion" of Cable Holdings' existing system. It planned to utilize the same head end and administrative facilities and the same established contracts and business relationships. The undisputed facts also show that Cable Holdings did not take the detailed steps regarding design work, checking the territory with utility representatives or engaging a contractor to install cable after ordering the strand maps in November, 1980. (At the end of November Wometco filed its counterclaim based on the alleged agreement of Cable Holdings with Home Video.)

Cable Holdings' established business and experience in the market go towards establishing the first and fourth elements of the *Martin* test, and its obtaining of a franchise and ordering of strand maps and of some equipment bear on the second and third *Martin* elements. However, whether these actions and circumstances are sufficient to show preparedness presents a question of fact precluding summary judgment based on plaintiff's lack of preparedness to enter

---

**4.** *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977).

the Western Territory and resultant inability to prove antitrust injury. The undisputed facts do not show that plaintiff was not prepared to enter the Western Territory. Therefore, whether plaintiff suffered the type of injury which the antitrust laws were designed to prevent cannot be determined as a matter of law.

The plaintiff's claim for damages for Wometco's alleged violations of the Sherman Act, Sections 1 and 2, 15 U.S.C. §§ 1 and 2 is brought pursuant to 15 U.S.C. § 15. Section 15 provides that "[a]ny person who shall be injured in his business or property *by reason of anything forbidden in the antitrust laws* may sue therefor ...." Thus a causation requirement is included in the statute which has been expanded upon by the courts. The plaintiff has the burden of proving the fact of damage by showing that the anticompetitive activity is a material cause of the injury. *Zenith Radio,* 395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 1571 n. 9, 23 L.Ed.2d 129; *Comfort Trane Air Conditioning v. Trane Co.,* 592 F.2d 1373, 1383 (5th Cir.1979). The plaintiff need not show that all possible alternative sources of injury were not the cause of its injury, or, conversely, that the defendant's wrongful acts were the sole proximate cause of its injury. *Zenith Radio,* 395 U.S. at 114 n. 9, 89 S.Ct. at 1571 n. 9; *Comfort Trane,* 592 F.2d at 1383.

In its motion for summary judgment Wometco assumes that its acts were anticompetitive and asserts that there is no evidence that any of these acts caused injury to the plaintiff. In effect, Wometco argues, Cable Holdings' "fear of lawsuits" is too nebulous to satisfy the statutory causation requirement. Although such an argument may be relevant to a decision on a motion for directed verdict, the deposition testimony of Treibick, Cable Holdings' President, to the effect that the obstacles created by Wometco's pursuit of delays by litigation prevented him from ordering a "go

ahead" for development of the Western Territory, is sufficient to create an issue of fact on causation which precludes summary judgment for Wometco. Although it is apparent that Treibick is an interested party, it is not for the court on summary judgment to decide whether Mr. Treibick's explanation is credible.[5]

It may be that at trial, when Treibick's apprehensions and his business judgment that entry was foreclosed are considered in light of Wometco's acts, it could be found that the decision not to enter was caused by Wometco's acts. *See Poller,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458. Therefore, summary judgment is foreclosed, since there is a genuine issue as to whether Wometco's anticompetitive acts contributed materially to the frustration or failure of Cable Holdings' efforts to enter the Western Territory when it had a franchise and could naturally expand into that area from its existing facilities.

## VI. CLAYTON ACT CLAIM FOR INJUNCTIVE RELIEF

Wometco requests summary judgment on Cable Holdings' request pursuant to Section 7 of the Clayton Act for an injunction foreclosing Wometco's takeover of the Marietta Cable TV franchise. Wometco argues as follows: The relevant market for purposes of plaintiff's Section 7 claim is the Marietta Cable TV franchise area. Since Wometco's franchise area did not overlap with Marietta's prior to the acquisition, there was no direct competition between Marietta and Wometco prior to the takeover. Therefore, competition was not lessened by the acquisition. Since Wometco was not already competing in the market, its entry into the Marietta TV franchise area must be analyzed under "potential competition" doctrines. Wometco asserts that the undisputed facts show that Wometco was not a potential competitor or perceived as one by Marietta, so its acquisition

5. In its brief in support of its motion for summary judgment, Wometco complains that Cable Holdings has never answered certain portions of Wometco's Second Interrogatories regarding causation. The defendant cannot be heard to complain on this point, since it has not asked this court to impose sanctions for Cable Holdings' failure to respond.

of Marietta would not diminish competition in the provision of cable services in the relevant market.

Section 7 of the Clayton Act, 15 U.S.C. § 18, prohibits the acquisition by a corporation engaged in commerce,

> [o]f another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

Since this section bars acquisition "in any section of the country" which may have the prohibited effects, determination of the "relevant geographic market" is a necessary prerequisite to determining whether a merger violates the Clayton Act. *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 618, 94 S.Ct. 2856, 2868, 41 L.Ed.2d 978 (1974).

The Supreme Court in *Marine Bancorporation* focused on "the area in which the goods and services at issue are marketed to a significant degree by the acquired firm." 418 U.S. at 620–21, 94 S.Ct. at 2869–70. This circuit in *Jim Walter Corporation v. Federal Trade Commission*, 625 F.2d 676, 682 (5th Cir.1980) read that passage

> as saying that the relevant geographic market is the area of the country in which the acquired firm is a significant competitor. Such an approach recognizes that "it is the preservation of competition which is at stake, [and thus] the significant proportion of coverage is that within the area of effective competition." (cite omitted).

*Id.*

Wometco assumes that the market would only be the Marietta franchise area, under a limited and literal interpretation of the Supreme Court's holding in *Marine Bancorporation*. If Wometco's merger with Marietta would remove a potential competitor by absorbing a firm into the relevant geographic market that might have entered on its own, the merger would be anticompetitive and violative of the Clayton Act because it would eliminate potential competition. *See Mercantile Texas Corp. v. Board*

*of Governors of the Federal Reserve System*, 638 F.2d 1255 (5th Cir.1981). Assuming under Wometco's argument that the relevant geographic market is the Marietta system, the material facts are in dispute as to whether Wometco would have entered the franchise area on its own absent a merger. Cable Holdings has made a strong showing contravening Wometco's assertion that it would not have entered absent the merger. *See* Statement of Facts, *supra,* at 12–13.

Cable Holdings in answers to interrogatories stated that it considers the relevant geographic market to be "all of Cobb County." Wometco does not argue that the undisputed facts show that its acquisition of Marietta would not reduce competition throughout the county if that is the relevant market. Rather, Wometco argues that since it was already operating *within* Cobb County, it was not "outside" the market and could not be a new entrant. This assumption is erroneous. Even if Wometco is operating already in the relevant market, if its acquisition of a firm within that market further concentrates the market and reduces competition, the merger may violate the Clayton Act. *See United States v. Philadelphia National Bank,* 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963). Wometco has not sustained its burden of showing that the undisputed facts demonstrate that there is no triable issue of fact under plaintiff's Clayton Act claim.

In sum, Wometco's motion for summary judgment on the claims of Cable Holdings against it is DENIED, and Cable Holdings' motion for reconsideration is GRANTED.